**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CRAIG STEVEN SCHAFFOLD**, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | 2:10cv116 |
| v. | ) | **Electronic Filing** |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant | ) | |

## <u>OPINION</u>

### I.   INTRODUCTION

Craig Steven Schaffold ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g),

seeking review of the final determination of the Commissioner of Social Security ("Defendant"

or "Commissioner") denying his application for disability insurance benefits ("DIB") under Title

II of the Social Security Act, 42 U.S.C. §§ 401-433 ("Act"). This matter comes before the Court

on cross motions for summary judgment. (Doc. Nos. 5, 9).  The record has been developed at the

administrative level.  For the following reasons, Plaintiff's Motion for Summary Judgment will

be granted in part and the matter will be remanded to the Commissioner with direction to grant

benefits consistent with an onset date of November 13, 2007.


### II.   PROCEDURAL HISTORY

Plaintiff filed for DIB with the Social Security Administration July 12, 2007, claiming an

inability to work due to disability as of February 6, 2007. (R. at 72)[1].   Plaintiff application

initially was denied on September 14, 2007. (R. at 48 – 51).  A hearing was scheduled for May

---

[1]      Citations to Doc. Nos. 3 – 3-7, the Record, hereinafter, "R. at __."

11, 2009, and Plaintiff appeared to testify represented by counsel. (R. at 19). A vocational

expert, Frances Kinley, also testified. (R. at 19). The Administrative Law Judge ("ALJ") issued

his decision denying Plaintiff's application on May 19, 2009. (R. at 9 – 18). Plaintiff filed a

request for review of the ALJ's decision by the Appeals Council, which request was denied on

December 3, 2009, thereby making the decision of the ALJ the final decision of the

Commissioner. (R. at 1 – 5).

Plaintiff filed his Complaint on January 26, 2010. Defendant filed his Answer on April 1,

2010. Cross motions for summary judgment followed.


## III.   STATEMENT OF THE CASE

The relevant facts are limited to those records that were available to the ALJ when

rendering his decision. All other records newly submitted[2] to the Appeals Council or this Court

will not be considered. *See* DISCUSSION, *infra* at 13.

### A.   *General Background*

Plaintiff was born on July 5, 1970, and was thirty-eight years of age at the time of the

administrative hearing. (R. at 72). Plaintiff attended high school until twelfth grade and then

attended a vocational technical school. (R. at 22). Plaintiff lived with his wife, a three year old

son, and a one year old daughter. (R. at 28). Following his second back surgery, Plaintiff and his

wife switched traditional family roles, and Plaintiff became a full-time homemaker.

Plaintiff was last employed just prior to his February 6, 2007 surgery. (R. at 22). His

most recent job involved filling, grinding, and assembling body molds for an orthotics and

---

[2]

        R. at 329 – 32, Doc. No. 3-7; Ex. A, Doc. No. 6-1.

prosthetics company. (R. at 22). This required Plaintiff to lift between thirty and fifty pounds. (R. at 23). When Plaintiff's back first became problematic, he was moved to the pediatric department of the company, where the lifting typically ranged between ten to twenty pounds. (R. at 23). Plaintiff's jobs required frequent postural maneuvering, and he was on his feet for up to nine hours a day. (R. at 24). Plaintiff also worked a second job wherein he installed plate and tempered glass in residential and commercial settings. (R. at 24).

B. *Treatment History*

Plaintiff began treatment with orthopedic surgeon Vincent J. Silvaggio, M.D., on October 23, 2001, because of lower back pain symptomatic of degenerative disc disease. (R. at 212). Plaintiff was found to suffer from multi-level degenerative disc disease, and as a result underwent lumbar decompression at the L3-L4 level, and decompression and fusion at the L4-L5 level on October 24, 2005. (R. at 202, 213). The surgery included both a lateral mass fusion and a posterior lumbar interbody fusion. (R. at 213). In the months following the surgery, Plaintiff's pain was almost completely resolved. (R. at 213).

On June 7, 2006 Plaintiff visited Dr. Silvaggio for follow-up. (R. at 202). Plaintiff was sent for an MRI, as his back had worsened following several good months after his surgery. (R. at 202). Plaintiff's back had recently "popped," and he was experiencing back pain and some numbness in his feet. (R. at 202). The MRI showed only a small protrusion at the L4-L5 level, and an annular tear at the L2-L3 level. (R. at 202). Dr. Silvaggio felt that if given some time, Plaintiff's new pain would be resolved. (R. 202).

However, a subsequent MRI on June 14 showed degenerative disc disease at the T11-T12 level, mild facet arthropathy at the L1-L2 level, broad based asymmetric disc bulge and annular tear slightly more prominent than in previous imaging studies at the L2-L3 level, new

laminectomy defect and central disc bulge with associated left paracentral protrusion at the L3-L4 level, some scar enhancement and fluid collection at the L4-L5 level, and a minor disc bulge and facet arthropathy at the L5-S1 level. (R. at 171). By August 8, 2006, Plaintiff complained of greater pain when trying to care for his then only child. (R. at 199). Plaintiff had good strength in his lower extremities and was negative for straight leg-raising. (R. at 199). Dr. Silvaggio believed that the disc protrusion and annular tear were the pain generators. (R. at 199). Plaintiff was prescribed medication and an epidural injection for pain. (R. at 199). The injection reduced Plaintiff's pain from 8 to 5 out of 10. (R. at 170).

The record shows Plaintiff's first visit to his primary care physician Sandra C. Sauereisen, M.D., following his first surgery was August 28, 2006. (R. at 234). Dr. Sauereisen noted back pain, radiating to the leg with paresthesias and leg weakness. (R. at 235). At the time, Dr. Sauereisen prescribed vicodin for Plaintiff's pain, and diagnosed him with worsening back pain, arthritis of the back, and degenerative disc disease. (R. at 236).

Over the next several months, Drs. Silvaggio and Sauereisen observed that Plaintiff's pain continued unabated. (R. at 197, 231). Further MRI's showed degenerative disease of the spine and broad-based disc bulging. (R. at 195). Despite the fact that Dr. Silvaggio found Plaintiff always had good strength in his lower extremities and was negative in straight leg-raising, eventually his physical condition and resultant pain had deteriorated to the point at which a second surgery was determined necessary to provide relief. (R. at 194 – 95).

Plaintiff underwent "metal removal lumbar spine, exploration fusion mass, lumbar decompression L2-3, L3-4, lumbar fusion L3-4 with globus instrumentation, local bone, bone bank bone, and OP1 bone graft, posterior lumbar interbody fusion L3-4 with globus cage pack with local bone, re-insertion of instrumentation" on February 12, 2007. (R. at 161 – 64).

4

At a March 1, 2007 follow-up examination, Plaintiff's surgery was noted as having been completed successfully, the wound had healed well, and Plaintiff's strength in his lower extremities and leg-raising was good. (R. at 192). Then, on March 8, Plaintiff returned to see Dr. Silvaggio because of the onset of left leg pain running from his back to his groin, and through his thigh. (R. at 188). X-rays and lateral flexion-extensions showed no apparent problems at the surgical site. (R. at 188). Dr. Silvaggio felt Plaintiff was experiencing some nerve tension and prescribed some new pain medications. (R. at 188). Despite continuing to have good lower extremity strength and straight leg-raising, Plaintiff's leg pain subsequently improved little, and he still experienced pain in the back and buttocks. (R. at 186). Dr. Silvaggio thought that physical therapy would help resolve Plaintiff's ongoing pain. (R. at 186).

Plaintiff began a course of physical therapy on April 2, 2007 for rehabilitation following his second surgery. At his initial evaluation, Plaintiff had decreased lumbar lordosis, his lumbar spine flexion was 3 out of 4, and his extension was 2 out of 4. (R at 134). Plaintiff was noted as requiring skilled physical therapy, but his rehabilitation potential was good. (R. at 134). However, during the course of his physical therapy Plaintiff consistently complained of back and leg pain. (R. at 130 – 34).

On April 18, 2007, Plaintiff returned to Dr. Silvaggio's office and was examined by Jeffery A. Baum, M.D., after lifting his twenty-six pound son and hearing a 'pop' in his back. (R. at 185). Thereafter, Plaintiff suffered a great deal of back pain. (R. at 185). No leg pain was reported, but Plaintiff noticed numbness in his left thigh, and Dr. Baum observed a lot of spasm in Plaintiff's back. (R. at 185). No changes were noted at Plaintiff's surgical site, and Dr. Baum was unsure what was causing Plaintiff's pain. (R. at 185). Dr. Baum recommended that Plaintiff

ease his physical therapy routine, continue to take muscle relaxants and pain medication, and monitor his symptoms until his next appointment with Dr. Silvaggio. (R. at 185).

By May 3, 2007, however, Plaintiff was reporting increased back and left leg pain. (R. at 184). Plaintiff's pain was also continuing into the night. (R. at 184). While Plaintiff exhibited good strength in his lower extremities and negative straight leg-raising, Dr. Silvaggio recommended that Plaintiff undergo an MRI and remain off work. (R. at 184). An MRI was subsequently conducted, and on May 16 Dr. Silvaggio found evidence of new and worsened disc herniation at L2-L3, left sided, with nerve compression. (R. at 159, 183). Plaintiff was prescribed injections and additional pain medications. (R. at 183). Dr. Silvaggio also ordered Plaintiff to remain off work. (R. at 183).

On June 21, 2007, Plaintiff's failure to improve physically and reduce his pain lead Dr. Silvaggio to conclude that he could not return to work, and was likely permanently disabled. (R. at 182). Dr. Silvaggio sent Plaintiff to see Brian Cicuto, D.O., for pain management. (R. at 182). If Plaintiff was able to relieve his pain with Dr. Cicuto, Dr. Silvaggio believed he might be able to return to work. (R. at 182).

Dr. Cicuto first saw Plaintiff on July 20, 2007. (R. at 275). He observed that Plaintiff had recently been trying some pool exercises and had seen some relief from his symptoms. (R. at 276). Dr. Cicuto recommended Plaintiff begin a pain management program. (R. at 276). At his next appointment with Dr. Cicuto, Plaintiff was noted as having been compliant with his exercise regimen and in taking his medications. (R. at 271). Some reduction in symptoms was noted. (R. at 271). Dr. Cicuto encouraged Plaintiff to engage in normal daily activities as much as possible, including spending time with his children. (R. at 271). Plaintiff's movement, posture, sitting, and standing saw improvement, but his lumbar mobility was reduced with extension. (R. at 271).

In September of 2007, Plaintiff continued to experience significant back and bilateral leg pain, and had difficulty finding comfortable positions and staying active. (R. at 321). Plaintiff was also having difficulty caring for his son. (R. at 321). Despite continuing pain management with Dr. Cicuto, and good lower extremity strength and negative straight leg-raising, Dr. Silvaggio concluded that Plaintiff could not return to work because his pain would prevent him from being productive in a work environment. (R. at 321).

According to Dr. Silvaggio, in spite of continuing conservative management measures, Plaintiff's back pain did not abate. (R. at 213). Degenerative disc disease and disc protrusion resulted in nerve root compression causing significant back and leg pain. (R. at 214). Dr. Silvaggio finally concluded on November 13, 2007, that as a result of Plaintiff's physical condition and resultant back pain, he would not be able to maintain substantial gainful employment. (R. at 214).

Dr. Cicuto again saw Plaintiff March 9, 2008, and noted that Plaintiff was exercising properly, participating in normal daily activities, and maintaining his pain with medication. (R. at 265). Dr. Cicuto did note that he was concerned that Plaintiff was overmedicating. (R. at 265). Dr. Cicuto observed that Plaintiff may require further surgery to relieve symptoms, but that for the time being Plaintiff was attempting to avoid additional surgery with independent pain management. (R. at 265). Dr. Cicuto concluded that Plaintiff was doing reasonably well, though he had reduced lumbar extension. (R. at 265). He recommended Plaintiff engage in the Interdisciplinary Pain Rehab Program, but Plaintiff was unable to because his responsibilities in caring for his children at home did not allow him the time. (R. at 265).

Over the next several visits, Dr. Cicuto did not note any major changes in Plaintiff's condition. (R. at 326 – 28). Plaintiff was staying active and had been maintaining his

independent pain management routine well. (R. at 326). However, Plaintiff still had difficulty transitioning from sitting to standing, and had increased tightness in his lower back. (R. at 326). Plaintiff's intent to consult with a new neurosurgeon for potential treatment was considered a good idea by Dr. Cicuto. (R. at 326). Dr. Cicuto diagnosed Plaintiff with postlaminectomy pain syndrome, and back and leg pain, and recommended that Plaintiff continue his pain management routine as before. (R. at 326).

Despite continuing with pain management, Plaintiff's pain did not abate and began to include a burning sensation in his feet. (R. at 318). Plaintiff had chronic baseline pain, and had difficulty bending over just to pick up a laundry basket. (R. at 318). Throughout the course of treatment with Dr. Silvaggio, Plaintiff's pain seemed only to increase, even though his strength in his lower extremities never diminished, he exhibited negative straight leg-raising, and EMG studies showed no radiculopathy or neuropathy. (R. at 308 − 18, 323 − 24). By Plaintiff's last visit on record with Dr. Silvaggio on October 22, 2008, Dr. Silvaggio's opinion regarding Plaintiff's outlook had not improved. (R. at 308).

During his treatment with Dr. Silvaggio, Dr. Sauereisen, and Dr. Cicuto, Plaintiff had been maintained on vicodin, percocet, ibuprofen, flexeril, and neurontin for management of his pain.

### C. Administrative Hearing

At his hearing, Plaintiff testified that he has been on long-term disability through his former employer since his operation in February of 2007. (R. at 35). An independent medical examiner from Mutual of Omaha determined in February of 2009 that Plaintiff continued to be eligible for long-term disability benefits because of his condition. (R. at 35 − 36). Plaintiff is re-evaluated every two years. (R. at 35).

Plaintiff described his back and leg pain as constant, agonizing stabbing, burning, stinging pain. (R. at 25 – 26). Plaintiff testified that his doctors explained to him that his back was only going to get worse over time. (R. at 42 – 43). He stated that despite this, he did not like to take too much pain medication (R. at 26 – 27). On good days, he only needs half a percocet at a time, but on bad days he may need to take two. (R. at 26 – 27). Plaintiff also takes ibuprofen, neurontin, and flexiril for his pain. (R. at 37). However, some of the medications' side effects lessens his functionality during the day, so he limits his intake in order to be able to care for his children. (R. at 37).

Plaintiff is a stay-at-home dad who is primarily responsible for the care of his two young children five days a week. (R. at 33). However, over time, as Plaintiff's back and leg pain has worsened, he has found it necessary to call upon his mother, neighbor, and wife to help him with the children during the day. (R. at 33). Since February of 2007, Plaintiff has relied on others to help him with the children from five to eight days a month, because his back goes out and forces him to lie down until his muscles relax and he can stand. (R. at 34 – 35).

Plaintiff testified that in order to play with his children, he must be on the floor. (R. at 28). He only picks up his children if he is already seated or on the floor. (R. at 28). Standing and bending just to prepare meals is quite painful and can cause Plaintiff's back to go out. (R. at 28 – 30). Plaintiff tries to limit the time spent making food as much as possible. (R. at 29). Doing dishes, brushing his teeth, and laundry can be quite painful as well. (R. at 29 – 30). As a result, Plaintiff's wife does most of the laundry. (R. at 29). In terms of driving, Plaintiff avoids it unless he needs to take himself or one of his children to the doctor – in which case he asks his mother to accompany him. (R. at 39).

Plaintiff explained that he tried to do pushups approximately every other day because the activity made him feel better, psychologically. (R. at 30 – 31). Plaintiff did ten to fifteen pushups when he could, sometimes doing modified pushups, and sometimes doing full pushups on his toes. (R. at 31). For exercise, Plaintiff also does back and leg stretches. (R. at 32). Plaintiff enjoyed walking, but when he tries it now, his legs and feet will hurt and start burning. (R. at 32).

Following Plaintiff's testimony, the ALJ questioned vocational expert Kinley. Mr. Kinley was asked whether a hypothetical person of Plaintiff's age, education, and work experience, capable of only light exertional work without frequent stooping or lifting from floor-level, could perform any jobs existing in significant numbers in the national economy. (R. at 40 – 41). Mr. Kinley stated that the hypothetical person could perform unskilled assembly work, of which there were 715,000 jobs in the national economy; the person could perform the job of inspector, checker, or examiner, of which there were 286,000 positions in the national economy; or, the person could perform the job of packer, of which there were 157,000 positions in the national economy. (R. at 41).

The ALJ then altered the hypothetical to include only sedentary work and no frequent postural maneuvers. (R. at 41). Mr. Kinley stated that the hypothetical person could still perform sedentary, unskilled assembly jobs, of which there were 156,000 in the national economy; the person could perform sedentary inspector and checker jobs, of which there were 38,000 in the national economy; or, the person could perform the job of ticket checker, of which there were 70,000 positions in the national economy. (R. at 41). Plaintiff's attorney then asked Mr. Kinley to add that the hypothetical person would be off-task five to eight times per month. (R. at 42).

Mr. Kinley responded that no jobs would be available, because missing more than two days of work per month precludes one from holding most types of employment. (R. at 42).

**IV.     STANDARD OF REVIEW**

Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g)[3] and 1383(c)(3).[4]  Section 405(g) permits a district court to review the transcripts and records upon which the determination of the Commissioner is based.

---

[3] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[4] Section 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

This Court's review is limited to determining whether the Commissioner's decision is "supported by substantial evidence." 42 U.S.C. § 405(g); *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

If the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390. A district court cannot conduct a de novo review of the Commissioner's decision nor re-weigh the evidence of record. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986) ("even where this court acting de novo might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings."). In other words, as long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. § 706.

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v. Secretary of Health, Education & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence in the record and provide adequate explanations

for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

To be eligible for social security benefits under the Act, a claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A), 1382c(a)(3)(A); *Brewster v. Heckler*, 786 F.2d 581, 583 (3d Cir. 1986); *see also Stunkard v. Secretary of Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A), 1382c(a)(3)(B).

The Social Security Administration ("SSA"), acting pursuant to its legislatively delegated rulemaking authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the

list, the inquiry proceeds to step four, at which the SSA assesses whether the
claimant can do his previous work; unless he shows that he cannot, he is
determined not to be disabled.  If the claimant survives the fourth stage, the fifth,
and final, step requires the SSA to consider so-called "vocational factors" (the
claimant's age, education, and past work experience), and to determine whether
the claimant is capable of performing other jobs existing in significant numbers in
the national economy.  §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S. Ct. 376, 157 L.Ed.2d 333 (2003) (footnotes

omitted); *see also* 20 C.F.R. § 404.1520.  If the claimant is determined to be unable to resume

previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given the

plaintiff's mental or physical limitations, age, education, and work experience, he or she is able

to perform substantial gainful activity in the national economy.  *Doak v. Heckler*, 790 F.2d 26,

28 (3d Cir. 1986).

    In an action in which review of an administrative determination is sought, the agency's

decision cannot be affirmed on a ground other than that actually relied upon by the agency in

making its decision.  In *Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 67

S. Ct. 1575, 91 L.Ed. 1995 (1947), the Supreme Court explained:

    When the case was first here, we emphasized a simple but fundamental rule of
    administrative law.  That rule is to the effect that a reviewing court, in dealing
    with a determination or judgment which an administrative agency alone is
    authorized to make, must judge the propriety of such action solely by the grounds
    invoked by the agency.  If those grounds are inadequate or improper, the court is
    powerless to affirm the administrative action by substituting what it considers to
    be a more adequate or proper basis.  To do so would propel the court into the
    domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196.  The United States Court of Appeals for the Third Circuit has

recognized the applicability of this rule in the Social Security disability context.  *Fargnoli v.*

*Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision.

## V.   DISCUSSION

Plaintiff contends the ALJ's decision was without the support of substantial evidence. (Doc. No. 6). Specifically, the ALJ allegedly failed to give adequate weight to the medical opinion of Dr. Silvaggio, as opposed to Dr. Cicuto. (Doc. No. 6 at 4 – 10). Plaintiff also asserts that the ALJ erred in failing to credit properly his subjective complaints of pain and functional limitation. (Doc. No. 6 at 10 – 12). To bolster his position, Plaintiff cites evidence newly submitted to the Appeals Council and this court, but not provided to the ALJ.[5] (Doc. No. 6 at 4 – 12). Had all the aforementioned evidence been properly considered, Plaintiff contends that he would be entitled to DIB.

Defendant counters that not only did the ALJ properly weigh and credit the opinions of Drs. Silvaggio and Cicuto, he found Plaintiff's subjective complaints lacking in credibility due to inconsistencies between what Plaintiff averred in his application and his testimony at the administration hearing. (Doc. No. 10 at 11 – 19). Defendant also argues that Plaintiff's newly submitted evidence cannot be considered as a basis for rendering a decision. (Doc. No. 10 at 19 – 20). Defendant therefore argues that the ALJ's decision must stand.

With respect to new evidence, a claimant may submit such evidence to the Appeals Council for consideration so long as it is material to the period of alleged disability under consideration at the hearing. *Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001); 20 C.F.R. § 404.970(b). If the new evidence meets the requirements for review, the Appeals Council can

---

[5]

R. at 329 – 32, Doc. No. 3-7; Ex. A, Doc. No. 6-1.

evaluate the new evidence with the prior evidence as a whole to determine if the ALJ's decision was supported by substantial evidence. *Id.* However, the Appeals Council may decline review if the ALJ's decision is not at odds with the weight of the evidence on record. *Id.*

Where the Appeals Council denies review, the ALJ's determination becomes final. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. In such a case, a district court can only review that evidence upon which the ALJ based his or her decision. *Matthews*, 239 F.3d at 594-95. As a result, new evidence presented by a claimant to the Appeals Council, but not reviewed, is not within the purview of a district court when judging whether substantial evidence supports the ALJ's determination. *Id.* A district court is not bound by regulation when reviewing an ALJ's decision, but is instead bound by the Act. 42 U.S.C. § 405(g) states that a "court shall have power to enter, *upon the pleadings and transcript of record,* a judgment affirming, modifying, or reversing a decision of the Commissioner." *Matthews*, 239 F.3d at 594 (citing *Jones v. Sullivan*, 954 F.2d 125, 128 (3d. Cir. 1991) ("Because [the] evidence was not before the ALJ, it cannot be used to argue that the ALJ's decision was not supported by 'substantial evidence'")). A district court cannot, therefore, directly consider new evidence, but instead can remand for consideration "by the forum which is entrusted by the statutory scheme for determining disability *vel non*." *Matthews*, 239 F.3d at 594.

In order to remand, however, a claimant must make an appropriate request and showing. *Matthews*, 239 F.3d at 592. The claimant needs to satisfy three requirements. *Id.* at 594. First, the new evidence must be "new," in the sense that it is not cumulative of pre-existing evidence on the record. *Szuback v. Secretary of Health and Human Services*, 745 F.2d 831, 833 (3d Cir. 1984). Second, the new evidence must also be "material," in that: it is relevant to the time period and physical impairment(s) under consideration; it is probative; and it is reasonably possible that

such evidence would have changed the ALJ's decision if presented earlier. *Id.* Third, "good cause" must be shown for not submitting the evidence at an earlier time. *Id.* The court demands these three requirements be satisfied to avoid inviting claimants to withhold evidence in order to obtain another "bite of the apple" when the Commissioner denies benefits. *Matthews*, 239 F.3d at 595 (citing *Szubak*, 745 F.2d at 834). These requirements seek to assure that all material evidence is presented to the ALJ as soon as possible. *Id.* at 594-95.

Here, Plaintiff's new evidence was not considered by the Appeals Council because it declined to review Plaintiff's case. As such, the new evidence is not properly considered as part of the record. *Matthews*, 239 F.3d at 594. The Court will not review said evidence, and it will not inform its decision. Further, Plaintiff has failed to make a showing supporting remand in accordance with the requirements of *Szuback*. As a result, the case cannot be remanded to the ALJ for reconsideration of his opinion in light of Plaintiff's new evidence.

As support for his conclusion that Plaintiff was not disabled, the ALJ relied almost exclusively upon the treatment notes and assessments of Dr. Cicuto. (R. at 15 – 18). Dr. Cicuto's notes indicated that Plaintiff exercised regularly, including the performance of push-ups and flexibility exercises for his back. (R. at 16). Plaintiff had been compliant with and stable on his medication regimen, and had not abused his pain medication. (R. at 16). Dr. Cicuto found Plaintiff had no muscle atrophy and overall good muscle tone. (R. at 16). Further, Dr. Cicuto noted that Plaintiff was "doing well" in performing his household duties and in caring for his children. (R. at 16). The ALJ further found that Plaintiff was responsible for his household and all the attendant chores necessary to maintain it, and was also primarily responsible for the care of his two young children during the day. (R. at 15).

What the ALJ failed to discuss was the fact that Dr. Cicuto never made any limitations findings, or findings of any kind with respect to Plaintiff's ability to maintain full-time substantial gainful employment.  Dr. Cicuto never described with any specificity the types of exercises Plaintiff engaged in, or the degree of strain such exercises required.  The record described Plaintiff as performing ten to fifteen pushups every other day, as tolerated, and back flexibility exercises.  The ALJ failed to explain how this was equivalent to, or even probative of, Plaintiff's ability to hold a full-time job.  Further, Dr. Cicuto made certain negative findings, including significant limitations in Plaintiff's lumbar extension, and significant tightness in his lower back.  Dr. Cicuto also opined that Plaintiff's pain was organic in nature. (R. at 271).

The ALJ went on to dismiss summarily Dr. Silvaggio's conclusions regarding Plaintiff's ability to work, despite the consistency of his opinions over the course of Plaintiff's treatment. (R. at 16).  Dr. Silvaggio's opinion was considered conclusory, yet the ALJ failed to mention *any* of Dr. Silvaggio's findings, diagnoses, or the objective diagnostic testing/imaging results – which were compiled in conjunction with approximately eighteen examinations during the last two years of a course of treatment that spanned several years.

The ALJ reasoned substantial weight should be accorded to the assessments of Dr. Cicuto because he was the physician most directly responsible for, and familiar with, Plaintiff's condition and treatment, and therefore was in best positioned to provide an accurate account of Plaintiff's limitations. (R. at 17).  Again, the ALJ never explained what facts permitted such an inference.  He never even discussed the length or frequency of Plaintiff's treatment with Dr. Cicuto as opposed to Dr. Silvaggio or even Dr. Sauereisen.  As reflected above, Dr. Silvaggio examined Plaintiff eighteen times between July of 2006 and October of 2008.  Dr. Sauereisen

examined Plaintiff on four occasions between August of 2006 and November of 2007. In contrast, Dr. Cicuto saw Plaintiff only five times between July of 2007 and January of 2009.

The ALJ provided virtually no insight into his inclination to credit only Dr. Cicuto, and it is evident that the notion that Dr. Cicuto was in the best position to assess the limitations produced by plaintiff's chronic back impairment was not even remotely supported by the record. Furthermore, it was error for the ALJ to extrapolate findings leading to a determination of non-disability from Dr. Circuto's records and discount Dr. Silvaggio's findings and assessment in such a wholesale manner.

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)); *see also Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008) (a treating physician's opinions may be entitled to great weight - considered conclusive unless directly contradicted by evidence in a claimant's medical record - particularly where the physician's findings are based upon "continuing observation of the patient's condition over a prolonged period of time."); *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987); *Allen v. Bowen*, 881 F.2d 37, 41 (3d Cir. 1989); *Podedworney v. Harris*, 745 F.2d 210, 217 18 (3d Cir. 1984). And reports from consulting physicians who have examined the claimant and rendered assessments on conditions within their respective area of expertise are to be given appropriate evidentiary weight, which will vary based on the circumstance and the other medical evidence presented. *Gordils v. Secretary of Health and Human Services*, 921 F.3d 327, 328 (1st Cir. 1990) (citing *Rodriguez v. Secretary of Health and Human Services*, 647 F.2d 218, 223 (1st Cir.

1981) (weight to be afforded a consulting/examining physician's report "will vary with the circumstances, including the nature of the illness and the information provided the expert.").  For example, where the consulting/examining physician's report constitutes the only probative medical evidence on the condition in question, it may be entitled to great or even controlling weight.  *See Reid v. Chater*, 71 F.3d 372, 374 (10th Cir. 1995) (examining physician's report accorded significant weight where it was the only medical assessment on point and corroborated by other evidence).  Similarly, examining physicians' reports that rest on objective clinical test results may be entitled to significant or controlling weight.  *See Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

The ALJ clearly erred in failing to discuss, in any manner, the lengthy medical findings of Dr. Silvaggio.  It is also clear that the ALJ erred in failing to accord proper weight to  Dr. Silvaggio's findings and assessments.

The ALJ was correct in asserting that Dr. Silvaggio's opinion that Plaintiff was disabled was not dispositive.  But this statement alone is not sufficient to justify disregarding the entirety of his medical opinion, without more. *See Massaro v. Commissioner of Social Security*, 84 Fed. Appx. 175, 178 – 79 (3d Cir. 2003), and *Adorno v. Shalala*, 40 F.3d 43, 47 – 48 (3d Cir. 1994).

Dr. Silvaggio's assessment of Plaintiff's impairment and resulting limitations was based on continuing observation over a substantial period of time.  At the age of 32 Plaintiff began treatment with Dr. Silvaggio in 2001 because of lower back pain that was indicative of degenerative disc disease.  After four years Dr. Silvaggio's assessment of Plaintiff's impairment led him to recommend that Plaintiff undergo a multi-level decompression and fusion.  Plaintiff underwent that surgery at the age of 36.  Plaintiff initially recovered well from the surgery, but began to experience increasing pain after several months.  Both  Dr. Silvaggio and Plaintiff's

primary care physician, Dr. Sauereisen, documented the continuation of Plaintiff's pain and treated Plaintiff through a course of treatment involving conservative measures. Repeated MRI's documented additional disc disease, disc buldging, annular tears, a laminectomy defect, central disc buldge with associated paracentral protrusion, scar enhancement and fluid collection, and a minor disc buldge and facet arthopathy. Plaintiff's pain continued unabated.

Sixteen months after the initial surgery, test results and examination led Dr. Silvaggio to recommend a second more comprehensive surgery with decompression, fusion and bone grafting. Plaintiff underwent that surgery and was treated through conservative measures and therapy directly thereafter. Over a five month period plaintiff was treated with physical therapy, epidural injection, pain medication and treatment at a pain management clinic. Dr. Silvaggio began to form the opinion that Plaintiff likely was permanently disabled when this course of treatment failed to yield satisfactory results. Dr. Silvaggio documented new and additional herniation with nerve compression and then recommended that Plaintiff undergo treatment at a pain management clinic under the supervision of Dr. Cicuto.

Additional treatment at the pain management clinic under the direction of Dr. Cicuto over an additional four month period did not improve Plaintiff's physical limitations from his back pain beyond the level of being able to perform the basic activities of daily living. Dr. Silaggio identified additional degenerative disc disease and disc protrusion as the main causes of Plaintiff's deteriorating lower back impairment. It was only after a second comprehensive operation and several months of follow-up care that Dr. Silvaggio made the determination on November 13, 2007, that Plaintiff would not be able to maintain substantial gainful employment on a sustained basis. Up until that time Dr. Silvaggio remained optimistic or at least hopeful that

Plaintiff's condition would improve through conservative treatment and he would be able to return to productive employment.

The treatment records reflected that Plaintiff had good lower extremities strength and negative straight-leg raising test results both before and after each surgery and course of conservative treatment that followed. Throughout the course of treatment Plaintiff followed the prescribed treatment protocol and recommendations. These included compliance with an exercise regime, seeking to stay active and following an independent pain management routine. Dr. Silvaggio continued to opine that Plaintiff was disabled from all forms of substantial gainful activity after Plaintiff had participated in the course of pain management treatment under Dr. Cicuto's supervision. This assessment was made by Dr. Silvaggio 18 months after Plaintiff's second surgery had been performed and after consideration of Dr. Ciuto's insights, observations and assessments.

The treating doctors' notes are replete with observations and notations about Plaintiff's ongoing pain and resulting limitations. None of these physicians made entries that suggested Plaintiff was malingering or exacerbating his symptoms. Each continued to explore measures that might produce additional relief, with only minimal or very modest results.

Moreover, Dr. Cicuto did not render any findings or assessments that undermined Dr. Silvaggio's assessments. His recommendations were geared toward improving Plaintiff's pain management to the point where he could engage in the activities of daily living, and included such measures as keeping active and doing a modest exercise routine. In fact, near the end of his course of treatment Dr. Cicuto noted that despite Plaintiff's efforts to remain active, maintain an independent pain management routine, and engage in daily exercise, Plaintiff had difficulty

transitioning from sitting to standing and had increased tightness in his lower back. At that juncture Dr. Cicuto diagnosed Plaintiff with forms of chronic pain syndrome.

Throughout the course of treatment Dr. Cicuto did not note any major changes in Plaintiff's functional abilities. He sought to advance Plaintiff to the point where he could manage his pain and perform the basic activities of daily living. He noted and observed Plaintiff's difficulties in performing basic transitioning and physical movement. His treatment was undertaken in conjunction with Dr. Silvaggio's long-term treatment of Plaintiff's back impairment. The records, assessments and recommendations generated from Dr. Cicuto's course of treatment failed to provide any contradictions to or inconsistencies with Dr. Silvaggio's overall assessments of Plaintiff's impairment and the resulting limitations. It follows that the ALJ was not free to make extrapolations from Dr. Cicuto's course of treatment that completely were contrary to the import of all the other medical evidence of record. It likewise follows that the ALJ erred in using snippets from Dr. Cicuto's treatment records to support his wholesale discounting of Dr. Silvaggio's assessments and opinions. *See Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) (A single piece of evidence is not substantial where it is overwhelmed by other evidence or if it is not evidence but mere conclusion.); *Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) ("Substantial evidence can be considered as supporting evidence only in relationship to all the other evidence in the record.").

The ALJ also erred in his assessment of Plaintiff's testimony concerning the limitations produced by his physical impairments. The Act recognizes that under certain circumstances the subjective reporting of limitations may in itself may be disabling:

> [a]n individual's statement as to pain or other symptoms shall
> alone not be conclusive evidence of disability ...; there must be

23

> medical signs and findings, established by medically acceptable
> clinical or laboratory diagnostic techniques, which show the
> existence of a medical impairment that result from anatomical,
> physiological or psychological abnormalities which could
> reasonably be expected to produce the pain or other symptoms
> alleged and which, when considered with all evidence
> required to be furnished under this paragraph (including
> statements of the individual or his physician as to the
> intensity and persistence of such pain or other symptoms
> which may reasonably be accepted as consistent with
> the medical signs and findings), would lead to a
> conclusion that the individual is under disability.

42 U.S.C. § 423 (d)(5)(A); *Green v. Schweiker*, 749 F.2d 1066 (3d Cir. 1984). The United States

Court of Appeals for the Third Circuit has set forth a four-prong standard to be used by district

courts when reviewing assessments of the Commissioner based on subjective reports of

significant limitations: (1) subjective complaints are to be seriously considered, even where not

fully confirmed by objective medical evidence; (2) subjective complaints may support a claim

for disability benefits and may be disabling; (3) when such complaints are supported by medical

evidence, they should be given great weight; and finally, (4) where the claimant's testimony

about the reported limitation is reasonably supported by medical evidence, the ALJ may not

discount the limitation without contrary medical evidence. *Ferguson v. Schweiker*, 765 F.2d 31

(3d Cir. 1985).

      With respect to Plaintiff's subjective complaints, the ALJ acknowledged Plaintiff's pain

and the fact that he often needed to lie down to relieve his pain. (R. at 16). He also noted that

Plaintiff relied on pain medication to provide relief. (R. at 16). Yet, the ALJ determined that

Plaintiff's subjective complaints were not supported by the findings of Dr. Cicuto, and therefore

were not sufficient to show Plaintiff was disabled. (R. at 16).

As discussed above, the ALJ's assessment was not supported by substantial evidence. In this regard the paucity of the medical findings highlighted by the ALJ demonstrates just how little of the factual record actually supported his conclusion.

In evaluating such limitations, an ALJ must accord subjective complaints the same treatment as objective medical reports, in that he or she must weigh all the evidence and explain his or her reasons for crediting and/or rejecting such evidence. *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 122 (3d Cir. 2000). In doing so serious consideration must be given to subjective complaints where a medical condition exists that could reasonably produce such complaints. *Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993). When medical evidence provides objective support for the subjective complaint, the ALJ can only reject such a complaint by providing contrary objective medical evidence. *Mason*, 994 F.2d at 1067-68. And "in all cases in which pain or other symptoms are alleged, the determination or decision rationale must contain a thorough discussion and analysis of the objective medical and the other evidence, including the individual's complaints of pain or other symptoms and the adjudicator's personal observations. The rationale must include a resolution of any inconsistencies in the evidence as a whole and set forth a logical explanation of the individual's ability to work." *Schaudeck v. Commissioner of Social Security*, 181 F.3d 429, 433 (3d Cir. 1999) (citing S.S.R. 95-5p at 2 (1995)). An ALJ also must give a claimant's subjective description of his or her inability to perform light or sedentary work serious consideration when this testimony is supported by competent evidence. *Id.*

The ALJ failed to adhere to these standards in assessing the credibility of Plaintiff's subjective complaints. Plaintiff specifically noted that between five and eight days each month he was unable to care for his children and perform other household duties because of his back

pain.  On those days, he has to rely on others for help.  At the hearing the vocational expert explained that a person with such a limitation could not hold full-time employment.

Moreover, the Commissioner contends that Plaintiff's claims of disabling pain are exaggerated because not only did Dr. Cicuto state on one occasion that Plaintiff was "doing well" at home with his kids and with his pain management, but Plaintiff claimed he was capable of a carrying out a large number of tasks at home and with his kids in his functional reports – contradicting his hearing testimony. (Doc. No. 10 at 15 – 19).  However this is not entirely accurate, and ignores a wide array of medical and other evidence supporting Plaintiff's subjective complaints, and the fact that the ALJ never mentioned these asserted "inconsistencies" in his decision.

Throughout Plaintiff's function reports he conditioned all his activities at home and with his children with the qualification that his level of functionality depended upon how his back felt. (R. at 107 – 112, 115).  He stated that his back often went out and did not allow him to do anything. (R. at 110).  Plaintiff acknowledged five months after his second surgery that he mowed the lawn once a week, would go shopping once or twice a week for up to an hour and a half, and could walk one quarter to one half of a mile before needing to stop due to pain. (R. at 109 – 110, 112).  However, Plaintiff maintained throughout his function reports that his pain was constant and limited everything he did.  Some days he could barely walk a block. (R. at 112).  Plaintiff described how he had difficulty dressing his lower body, shaving, brushing his teeth, and cooking. (R. at 108).  He also no longer participated in sports, and could only garden and play with his son when his back did not prevent it. (R. at 109 – 111).

What the record in this case shows is that Plaintiff had a history of back pain beginning in 2001. (R. at 212).  His back condition required surgery in 2005. (R. at 202, 213). The failure of

the first surgery to provide significant, lasting relief required a second surgery in 2007. (R. at 161 – 64). Only two months subsequent to the second surgery, Plaintiff's back pain was severe and his back exhibited palpable spasm. (R. at 185). Multiple imaging tests over the following months produced evidence of new and worsening disc herniation and nerve root compression. Despite pain management treatment and a relatively modest level of daily activity, Dr. Cicuto noted that Plaintiff would likely require another surgery to alleviate his pain, and that transitioning from sitting to standing, increased tightness in his lower back, and reduced lumbar extension were ongoing problems. (R. at 265, 326). Dr. Cicuto diagnosed Plaintiff with postlaminectomy pain syndrome, and back and leg pain, and opined that Plaintiff's pain was organic in nature. (R. at 271, 326). He never stated or even implied that Plaintiff was anywhere close to having the capacity for fulltime work.

In contrast, Dr. Silvaggio consistently concluded after the second surgery failed to provide lasting relief and conservative measures failed to improve Plaintiff's level of functionality that Plaintiff was incapable of meeting the demands of full-time work. These assessments were based upon his professional medical observations and ongoing imagining results. Further, Plaintiff was maintained on multiple pain medications throughout his treatment. None of his treating or consulting doctors expressed any doubt about his allegations of pain, and continually prescribed pain medication and other forms of therapy and treatment for his symptoms.

It follows that Plaintiff's claimed need to minimize his physical activities due to the onset of pain, his periodic inability to function at home on a meaningful level due to pain, and his inability to cope with his pain on any given day, find more than ample objective support in the medical evidence. Because there were medical bases for Plaintiff's complaints and the treating

and consulting sources did not doubt the existence of Plaintiff's pain, the ALJ erred in failing to accord proper weight to this aspect of the record. *See Stewart v. Sullivan*, 881 F.2d 740 (9th Cir. 1989) (it is error to reject consistent evidence of excess pain on the ground that it is not supported by objective medical findings where there is medical evidence to support the existence of some pain); *Ferguson v. Schweiker*, 765 F.2d 31 (3d Cir. 1985) (where claimant's testimony as to pain reasonably is supported by medical evidence, the ALJ may not discount the pain without contrary medical evidence; and where the complaints are supported by medical evidence, they are to be given great weight).

Moreover, as explained by the vocational expert, these limitations preclude substantial gainful activity because an individual would have excessive absences or otherwise would not be able to stay on task for the requisite number of days each month. There was no probative medical evidence advanced by the ALJ that undermined or countered the claimed impact of Plaintiff's impairments and the resulting limitations.

Finally, it was error for the ALJ to advance Plaintiff's admitted ability to perform the activities of daily living and engage in functional activities on occasion as a basis for discounting the medical evidence and Plaintiff's subjective complaints regarding the limitations produced by his deteriorating lower back impairment. It is well-settled that "disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity." *Wright v. Sullivan*, 900 F.2d 675, 682 (3d Cir. 1990) (quoting *Smith v. Califano*, 637 F.2d 968, 971 (3d Cir. 1981)). To the contrary, the ability to engage in "sporadic or transitory activity does not disprove disability" and may well indicate merely that the claimant is only partially functional on a periodic basis. *Id.* Here, when the record is closely reviewed as a whole, an inference of partial functionality is all that can be drawn from Plaintiff's efforts to remain

compliant with the exercise and independent pain management regimes prescribed by his physicians. Similarly, Plaintiff's self-reported efforts at performing care-giving functions, occasional household chores and periodic participation in social events shows no more than partial functionality. Furthermore, as noted above, Plaintiff prefaced all his reports about his abilities with the qualification that all such activities were dependent upon his back condition and the resulting pain and limitations produced therefrom. Under these circumstances it was improper for the ALJ to put significant weight on the fact that Plaintiff admitted to being functional periodically and discounting the remaining aspects of the record which provided the context needed to understand such matters. The Act certainly does not require one to avoid honesty in recounting one's personal abilities to establish disability and an individual who does so would appear to be more credible, not less, when it comes to determining whether subjective complaints and limitations are worthy of belief.

The administrative record was fully developed. The record as a whole only provided substantial evidence indicating that Plaintiff was disabled because he was off-task due to back pain five to eight times each month. *Morales*, 225 F.3d at 320. Plaintiff's back impairment could reasonably be expected to have produced Plaintiff's reported back pain and the resultant periodic lack of functionality claimed. There was no contradictory evidence which rebutted the claim. While Plaintiff was able to maintain a certain level of activity in his home, and was "doing well" there, that alone did not signify that he was capable of full-time work – eight hours a day, five days a week. The vocational expert made clear that someone with Plaintiff's limitations could not maintain full-time employment. Even though Dr. Silvaggio's medical opinion that Plaintiff was unable to work was not dispositive, the fact that he continually maintained this position over a substantial period of time certainly was probative and weighty.

Finally, none of the doctors doubted Plaintiff's pain and his reported limitations. And while it may be that Plaintiff's impairment and pain tolerance will improve over time, the evidence of record did not evidence such a trend and as a whole only provided substantial evidence in support of Plaintiff's claim that he was disabled under the Act.

## VI. CONCLUSION

The Act describes disability as the inability to engage in substantial gainful activity by reason of a physical or mental impairment that has lasted or can be expected to last for a continuous period of at least twelve months. The ability to engage in substantial gainful employment means more than the ability to do certain of the physical and mental acts required on the job; the claimant must be able to sustain the physical and mental demands of work-related activities throughout continuous attendance in a regular work week. *Dobrowolsky v. Califano*, 606 F.2d 403, 408 (3d Cir. 1979). The question thus is not whether a claimant can perform activities consistent with substantial gainful activity on any particular day, but whether the claimant has the ability to engage in work activities on a systematic and sustained basis. Plaintiff had the burden of making out a prima facia case that he was disabled within in the meaning of the Act. *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980); *Livingston v. Califano*, 614 F.2d 342, 345 (3d Cir. 1980); 20 C.F.R. § 404.1512(a). This burden generally is met where the record clearly substantiates a claimant's subjective claim that he or she has an impairment which prevents the claimant from engaging in substantial gainful activity. *Rossi v. Califano*, 602 F.2d 55 (3d Cir. 1979). Here, the substantial evidence of record supports only the conclusion that plaintiff could not engage in such activity at least as of November 13, 2007, when Dr. Silvaggio indicated that the limitations from Plaintiff's progressively deteriorating back impairment had progressed to a point where it had prevented him from meeting the demands of substantial gainful activity on a regular and sustained basis. At that juncture Dr. Silvaggio had concluded based on examination and testing that conservative treatment was not going to restore Plaintiff's

pre-surgery level of functionality.  While Plaintiff's impairment and his level of functionality may improve, there was no subsequent evidence that undermined this assessment and the evidence bearing on Plaintiff's impairment and limitations prior to that date only provided substantial evidence to support that assessment.  Accordingly, to the extent the ALJ's findings and conclusions reflected a determination that Plaintiff was not disabled at or after that point in time they were not supported by substantial evidence.  As a result, Plaintiff's motion for summary judgment must be granted in part and the matter will be remanded to the Commissioner with direction to grant benefits consistent with an onset date of November 13, 2007.

Accordingly, Plaintiff's Motion for Summary Judgment will be granted in part; Defendant's Motion for Summary Judgment will be denied; the decision of the ALJ will be vacated and reversed in part; and the matter will be remanded  with direction to grant benefits consistent with an onset date of November 13, 2007.  An appropriate order will follow.

Date: January 11, 2011

s/ David Stewart Cercone
David Stewart Cercone
United States District Judge

cc:     Joseph S. Hornack, Esquire

        Lee Karl, AUSA

        Via: CM/ECF Electronic Filing